Filed 5/7/21  P. v. Valera CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOEL VALERA,<br><br>    Defendant and Appellant. | F078195<br><br>(Super. Ct. No. F14902319)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Houry A. Sanderson, Judge.

Matthew A. Siroka, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Berstein and Cameron M. Goodman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Joel Valera appeals following his conviction by jury of first degree murder (Pen. Code, § 187, subd. (a);[1] count 1) with the special circumstance that he intentionally discharged a firearm which caused great bodily injury or death (§ 12022.53, subd. (d)).[2] Appellant challenges his conviction on multiple grounds. He claims the trial court improperly rejected his request to represent himself and thereby denied him his right to testify, prejudicially excluded certain evidence under improper hearsay rulings, and failed to instruct the jury on appropriate defense theories. Relatedly, he argues he received ineffective assistance of counsel with respect to some of these claims. Further, appellant contends there were errors in his sentencing proceeding. And, in a deferred motion, appellant's counsel requests expansion of their appointment to file a partially related habeas corpus petition. Ultimately, appellant seeks a retrial on his first degree murder conviction. For the reasons set forth below, however, we reject his current allegations of error and affirm his conviction. Additionally, though, we grant counsel's request to expand their appointment to file a habeas corpus petition.

## FACTUAL BACKGROUND

On March 7, 2014, appellant shot and killed his neighbor, Arthur Gomez, Jr. (Gomez), as the two stood in their respective yards. Although there were some inconsistencies in the various witnesses' testimonies, a general set of facts emerged regarding the shooting.

---

[1] All future statutory references are to the Penal Code unless otherwise noted.

[2] Appellant was also convicted by jury of shooting at an inhabited dwelling (§ 246; count 2) with the special circumstance that he intentionally discharged a firearm which caused great bodily injury or death (§ 12022.53, subd. (d)) and giving false information to a police officer (§ 148.9, subd. (a); count 5). He further pled guilty to two counts of possession of a firearm by a felon (§ 29800, subd. (a)(1); counts 3 & 4). We note the abstract of judgment incorrectly places appellant's conviction on count 2 under section 245. We order the abstract be corrected to reflect section 246.

2.

Gomez, his sons (A.G. and J.G.), and their cousin A.M.[3] were preparing to leave on a church camping trip. Gomez and A.G. were inside their house while J.G. and A.M. were out front trying to see who could whistle louder. While outside, J.G. noticed appellant staring at him from appellant's front door. Feeling uncomfortable, J.G. went inside and told Gomez about appellant's conduct.

Although he did not immediately respond, Gomez went outside shortly thereafter and was followed by A.G. a few moments later. Appellant made some comments to Gomez, purportedly about Gomez's children throwing trash in appellant's yard. Gomez either simply said, "What's up," to appellant or told appellant that his children were doing no such thing. During this interaction, Gomez walked toward appellant's house and the three children outside may have followed behind him.

Roughly in tandem, appellant exited his house carrying a shotgun, walked a short distance toward Gomez, raised the shotgun, and fired three times. Two shots struck Gomez, one toward the front of his body and one on the side. Gomez responded by running into his house where he collapsed. Ultimately, Gomez died from his injuries.

Several witnesses called 911, including appellant. Police arrived and arrested appellant without incident. Police learned that appellant had been living at his house under an assumed name and found both a shotgun and handgun in the residence, along with ammunition. Appellant's girlfriend stated she bought the weapons but that they were generally kept in appellant's bedroom.

Appellant was charged with several offenses, including first degree murder, firing at an inhabited dwelling, being a felon in possession of a firearm, and providing false information to the police. The core issues in this appeal generally relate to issues arising during appellant's trial on the first degree murder charge. As these raise unique issues, we detail relevant facts when discussing each below.

---

[3] All three anonymized witnesses were minors at the time of the shooting.

Appellant was ultimately convicted by jury of first degree murder and firing at an inhabited dwelling along with their charged enhancements, as well as giving false information to a police officer.

This appeal timely followed.

## DISCUSSION

### *Appellant's Request to Represent Himself*

Appellant's first argument on appeal is that he was denied his right to represent himself at trial and, based on that erroneous ruling, effectively forced not to testify at trial. The crux of the argument is that appellant, when unable to discharge his trial counsel through normal procedures, properly requested to represent himself but was incorrectly denied that right. As appellant had made clear to the trial court that he would not testify if his trial counsel was asking the questions, he argues this ruling denied him his constitutional right to testify by forcing a choice between maintaining trial counsel or testifying in his defense. Upon review, we find no error.

*Factual Background*

On the first day of jury selection, appellant did not appear at the court dressed in regular clothing. When asked why, appellant stated he had chosen not to wear regular clothing because he wanted a *Marsden* hearing. The court complied and held a confidential hearing on his request. At this hearing, appellant alleged counsel could not argue the way he wanted her to because she had not been present at the scene of the shooting. In a colloquy with the judge he expanded on his issues, complaining he had not received copies of certain pretrial motions and identifying certain issues with how those motions were argued in pretrial proceedings. Appellant also raised several issues he was having with his physical and mental health that he claimed he wanted addressed before trial. The trial court noted that many of the issues raised were with the court's rulings and not counsel's conduct before denying the request on the grounds that counsel was

4.

providing adequate representation and there was no break in the attorney-client relationship.

The case proceeded to trial. After the close of the prosecution's case and the presentation of one defense witness, the court asked appellant's counsel if appellant would be testifying in his defense and whether any motions were expected before any testimony began. Counsel responded, with appellant present, that appellant would testify the next day and that she expected no other motions to be filed.

When appellant arrived at court the next day, he informed the court he wished to have a *Marsden* hearing. The court held that confidential hearing and again denied appellant's request When the court publicly reconvened, it immediately noted that appellant suggested he wanted to represent himself and asked if that was still the case. Appellant confirmed he wished to represent himself going forward.

The court then rejected this request. The court noted appellant's right to represent himself generally but concluded the request in this instance was not timely because it was made well into trial and after the prosecution had rested. The court concluded this meant the request for self-representation was within the court's discretion and proceeded to consider the factors set forth in *People v. Windham* (1977) 19 Cal.3d 121 (*Windham*) to determine whether it would grant the request. The court concluded appellant's counsel had provided adequate to above adequate representation to that point and that appellant's previous attempts to replace counsel showed his issues were with strategic decisions and appeared in part to be an attempt to avoid having the trial come to a timely conclusion. The court further noted the case had been pending for four and a half years, and in trial for 15 days to that point, with the full prosecution case having been presented and one defense witness completed. The court thus concluded that further delay of the proceedings would be inappropriate with respect to the jury and that a mistrial would be unfair to the prosecution and the jury.

Immediately following this ruling, appellant's counsel requested a sidebar and, upon its completion, appellant requested another *Marsden* hearing to replace his counsel. In the discussion that followed that hearing, the court questioned appellant about his ability to proceed if he were to represent himself, seeking to understand what delay if any would be required. Appellant explained he would be ready to proceed but said, "The only thing is I can't ask myself questions." The court asked whether appellant "would need to look into resources in order to decide how to go about it," to which the defendant replied, "Correct," and confirmed he would need some time to figure out the "resources" he'd need. The court then confirmed it was denying appellant's request to represent himself.

The court and appellant discussed whether he would testify at the trial. Appellant contended he could not answer that question while represented by his trial counsel, stating, "I can't answer that unless I feel it's an attorney or somebody that is willing to ask the questions that I tell her to ask." After a short additional discussion, the court held the requested *Marsden* hearing.

When the court went back on the record, the court again pressed appellant on whether he would testify at the trial. Appellant did not respond, and the court made a detailed oral record of his conduct during the time, noting appellant was merely flipping through documents, not looking at the court, and refusing to answer. The court recessed until the afternoon. When it reconvened, counsel informed the court that appellant had refused to meet with her during the break. The court advised appellant of his rights, reviewed the prior proceedings, and asked again if appellant would testify. Appellant instead requested a *Marsden* hearing on the ground he believed the defense had at least five more witnesses to call and that counsel was "railroading me." Counsel confirmed, as she had stated previously, that she had no other witnesses she intended to call, and the court rejected appellant's *Marsden* request. It then recessed until the next day.

The next day, appellant again requested a *Marsden* hearing or to represent himself. The court rejected this request and asked appellant again whether he would be testifying. He refused to provide an answer, other than complaining about his counsel, at which point the court began to move on. Appellant then interjected that he did want to testify and stated, "but I don't want her as my attorney." At some point, appellant loudly banged on the table in front of him. After substantial warnings and discussions about the need to proceed in an orderly manner, appellant was removed from the courtroom and ultimately for the remainder of the proceedings. He did not testify.

*Standard of Review and Applicable Law*

"[I]n order to invoke the constitutionally mandated unconditional right of self-representation a defendant in a criminal trial should make an unequivocal assertion of that right within a reasonable time prior to the commencement of trial." (*Windham*, *supra*, 19 Cal.3d at pp. 127–128.)

"[O]nce a defendant has chosen to proceed to trial represented by counsel, demands by such defendant that he be permitted to discharge his attorney and assume the defense himself shall be addressed to the sound discretion of the court. When such a midtrial request for self-representation is presented the trial court shall inquire *sua sponte* into the specific factors underlying the request thereby ensuring a meaningful record in the event that appellate review is later required. Among other factors to be considered by the court in assessing such requests made after the commencement of trial are the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion. Having established a record based on such relevant considerations, the court should then exercise its discretion and rule on the defendant's request." (*Windham*, *supra*, 19 Cal.3d at pp. 128–129.)

The requirement for a reasonable pretrial request "must not be used as a means of limiting a defendant's *constitutional* right of self-representation." (*Windham*, *supra*, 19 Cal.3d at p. 128, fn. 5.) Rather, the requirement's purpose is to prevent a defendant from misusing the right of self-representation "as a means to unjustifiably delay a scheduled trial or to obstruct the orderly administration of justice. For example, a defendant should not be permitted to wait until the day preceding trial before he moves to represent himself and requests a continuance in order to prepare for trial without some showing of reasonable cause for the lateness of the request." (*Ibid*.) Thus, "[w]hen the lateness of the request and even the necessity of a continuance can be reasonably justified the request should be granted. When, on the other hand, a defendant merely seeks to delay the orderly processes of justice, a trial court is not required to grant a request for self-representation without any ability to test the request by a reasonable standard." (*Ibid*.)

### *The Trial Court Did Not Abuse Its Discretion*

Appellant contends that the trial court abused its discretion in denying appellant's request to represent himself because it failed to inquire with sufficient specificity into the delay that would be caused by such a change. Appellant argues that the court's ruling acknowledged appellant's legitimate dispute with counsel regarding her strategy but failed to properly balance the *Windham* factors because it never actually determined what type of delay would be caused by permitting appellant to proceed as his own counsel. He posits that little disruption, if any, could occur because the request was made so close to the close of trial. We do not agree.

The court created a detailed record in this case, both of its analysis of this issue, and of the multitude of issues that appellant introduced in the proceedings as the case concluded. While the record does not disclose a detailed analysis of how long a delay might have arisen if appellant was permitted to proceed as his own counsel, such an accounting was not necessary in this case. The court properly detailed the extensive

8.

pretrial and trial proceedings that had occurred, noted the jury was reaching the end of its time with the case, and identified potential irregularities in appellant's conduct that suggested his motivations were to create delay. Further, the court considered appellant's statements that trial counsel was ineffective or otherwise not properly proceeding and rejected those contentions, both in the context of the unchallenged *Marsden* hearings and in the context of how those complaints related to appellant's decision to seek self-representation at that stage in the proceedings.

Considering counsel's performance, the overall record shows that the trial court considered counsel to have performed adequately to above adequately throughout the trial, suggesting changing counsel would not be appropriate. Looking at the delay involved, the record ultimately reveals that appellant wanted a multi-day delay to research potential "resources," which the record suggests could be as simple as how to ask himself questions but could also be as complex as seeking to call the additional witnesses he insisted should have been called. Finally, reviewing appellant's motivations, while a cold record can oftentimes be difficult to decipher, the court's detailed real-time account of appellant's subsequent conduct to create delay and chaos strongly implies that the court's oral pronouncements that appellant was seeking delay prior to those actions were based on more than mere hunches.

Ultimately, the *Windham* factors are a mechanism by which the court seeks to ensure the defendant is not belatedly using the right to self-representation "as a means to unjustifiably delay a scheduled trial or to obstruct the orderly administration of justice." (*Windham*, *supra*, 19 Cal.3d at p. 128, fn. 5.) Upon review of the record, there appears no basis upon which appellant's request "can be reasonably justified." (*Ibid.*) His counsel was performing adequately, his strategy objections were insufficient to warrant removal, his request would incur delay deemed meaningful by the presiding court right at the conclusion of a 15-day trial, and his motivations were perceived and ultimately shown

to be part of a broader delay tactic. Considering these factors, we see no abuse of discretion in the court's denial of appellant's request to represent himself.

Having concluded the court made no error in refusing appellant's request to represent himself, we further conclude there was no forced choice between proceeding with counsel or testifying in this case. The record recounted above amply demonstrates that any refusal to testify was appellant's own willful choice. He was repeatedly offered the opportunity to testify yet refused because he was either unhappy with the court or actively attempting to sabotage his trial. The court regularly reviewed counsel's performance at appellant's request and properly determined there was no basis upon which to relieve counsel. That appellant, having utilized counsel through pretrial and trial proceedings, suddenly insisted he would only testify if counsel was replaced—despite failing to object on such grounds when it was first indicated he would testify the next day—is not a basis to conclude the court forced an improper choice upon appellant. Rather, it is clear on this record that it was appellant that attempted to create a conflict where none existed.

### *The Contested Hearsay Rulings*

Appellant raises two partially related hearsay rulings he contends resulted in the trial court erroneously excluding evidence related to a potential imperfect self-defense claim. In the first, the trial court excluded a recording of the 911 call appellant placed after shooting Gomez. In the second, the trial court sustained hearsay objections to questions seeking to elicit the fact that members of Gomez's family had cursed about appellant on some occasions. Appellant argues the first error wholly deprived him of his potential imperfect self-defense position. Appellant recognizes the second error was not so prejudicial as to require reversal but contends that it adds to a cumulative error analysis on this issue. Appellant also raises an ineffective assistance of counsel claim, alleging that counsel's failure to raise any admissibility ground for appellant's 911 call other than Evidence Code section 1250 constituted ineffective assistance of counsel.

10.

*Factual Background*

After shooting Gomez, appellant placed a 911 call. During the call he provided a false name and wrongly told police people were shooting at his house. He also, however, admitted to shooting Gomez and stated he did not see Gomez with a weapon, even correcting the dispatcher when his statements that someone who had come to his house after the shooting had a gun were interpreted to mean he had seen Gomez with a weapon. Relevant to the issues here, appellant stated in the call that Gomez had approached him in a threatening manner, yelling and cursing at him, and that Gomez and others had surrounded his house prior to the shooting.

As part of the defense case, appellant sought to introduce into evidence the 911 call and similar statements appellant made during his police interrogation. Appellant argued the statements were relevant to an imperfect self-defense claim because they highlighted his perceptions of the event and thus the statements were not hearsay because they were not being introduced for the truth of the matter stated. In opposition, the prosecutor argued the statements were inadmissible under Evidence Code sections 1250 and 1252 because they were unreliable hearsay statements. The court reviewed Evidence Code section 1250 and confirmed with appellant's counsel that the evidence was offered to prove state of mind. The court then rejected appellant's request to introduce the statements, stating it was not convinced the evidence was admissible under Evidence Code section 1250 and that the court had previously "indicated that unless the People opened the door or somehow evidence needed to be brought in to impeach" appellant, it would not allow the evidence in. The court added that appellant's "decision, or lack of a decision, for whatever it's worth, to testify does not automatically let the court look into it and say a different ruling."

With respect to the cursing allegations, counsel attempted to cross-examine appellant's girlfriend about two occasions where she may have heard Gomez or persons

in his family cursing about appellant. The trial court sustained hearsay objections to the questions both times.

*Standard of Review and Applicable Law*

Hearsay is a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated. (Evid. Code, § 1200.) Several exceptions to this rule exist, including one that permits "evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation" when "offered to prove the declarant's state of mind … when it is itself an issue" (Evid. Code, § 1250, subd. (a)(1)) or "offered to prove or explain acts or conduct of the declarant" (*id*., subd. (a)(2)) provided the proffered statement is sufficiently trustworthy (Evid. Code, § 1252). Further, statements not offered for the truth of the matter asserted, but rather used circumstantially to demonstrate some other point such as the declarant's mental state, are not excluded by the hearsay rule. (See 1 Witkin, Cal. Evidence (5th ed. 2012) Hearsay, §§ 38, 40, pp. 831–835.)

We review evidentiary rulings for an abuse of discretion and an error is typically reviewed to determine whether "it is reasonably probable that defendant would have obtained a more favorable result in the absence of the error." (*People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 756 (*Sotelo-Urena*).) However, in rare instances where an evidentiary ruling effectuates a complete preclusion of a defense, such a ruling may constitute a violation of the defendant's constitutional right to present a defense and warrant a higher level of scrutiny. (*Ibid*.)

With respect to ineffective assistance of counsel claims, "a defendant must show that his or her counsel's performance was deficient and that the defendant suffered prejudice as a result of such deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–692.) To demonstrate deficient performance, [the] defendant bears the burden of showing that counsel's performance ' " ' "fell below an objective standard of reasonableness … under prevailing professional norms." ' " ' (*People v. Lopez* (2008)

12.

42 Cal.4th 960, 966.)  To demonstrate prejudice, [the] defendant bears the burden of showing a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.  (*Ibid*.; *In re Harris* (1993) 5 Cal.4th 813, 833.)"  (*People v. Mickel* (2016) 2 Cal.5th 181, 198.)

We review ineffective assistance of counsel claims de novo.  (*People v. Tapia* (2018) 26 Cal.App.5th 942, 950.)

*Any Alleged Errors Were Harmless*

In this case, whether reviewed as an evidentiary error or a claim of ineffective assistance of counsel, the record does not demonstrate harm under any relevant standard. Excluding the 911 call and any cumulative effect from excluding statements about cursing are insufficient to demonstrate the loss of an imperfect self-defense claim in this case.  As the defense would not have been proper even if the evidence were introduced, the exclusion of such evidence cannot support a claim of error.

To warrant a jury instruction, a claim of imperfect self-defense requires substantial evidence that the defendant killed in unreasonable self-defense.  (*People v. Elmore* (2014) 59 Cal.4th 121, 134.)  In this context, a fear of future harm is insufficient. " ' "[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future.  *An imminent peril is one that, from appearances, must be instantly dealt with.*" ' "  (*In re Christian S.* (1994) 7 Cal.4th 768, 783.)  Further, this assertion must be based on some objective basis to conclude that the defendant's unreasonable belief in the need for self-defense arose from the circumstances surrounding the situation and not some delusional belief.  (*Elmore*, at p. 138.)

The evidence excluded in this case provided no objective evidence that the situation created an unreasonable fear of imminent harm requiring self-defense. Appellant argues that the proffered evidence provides circumstantial evidence that he was fearful and indicates he felt surrounded and threatened.  However, such broad-based assertions alone cannot trigger an imperfect self-defense claim.  If merely experiencing a

13.

generalized fear is sufficient, this purportedly narrow doctrine would swallow virtually all murder charges.

In this sense, this case is similar to *People v. Oropeza* (2007) 151 Cal.App.4th 73, 78–81, where the defendant sought an imperfect self-defense instruction after allegedly firing a shot at another vehicle in a road rage incident. There, as here, the defendant "did not testify and made no out-of-court comments indicating that when he fired, he believed it necessary to defend his life or to avoid great bodily injury." (*Id*. at p. 82.) Similarly, no other witnesses provided objective evidence sufficient to indicate a fear of harm in the defendant or an actual need to use deadly force from which the defendant's generalized fear could trigger an imperfect self-defense claim. (*Ibid*.) Here, appellant went no further than claiming people approached him in a threatening way after he complained about trash issues. "The only substantial evidence of appellant's state of mind is found in testimony concerning his aggressive and provocative behavior. It suggests only that he fired the shot[s] as an act of aggression." (*Ibid*.) Accordingly, the exclusion of generalized evidence of a purported fear or past issues of potential dispute could not be harmful in this case as they could not trigger an obligation to instruct on imperfect self-defense, even if admitted.[4]

### *Imperfect Self-defense Instruction*

Referring partially to the arguments raised concerning the hearsay objections, appellant next argues that the trial court wrongly rejected his request to instruct the jury

---

[4] We reject appellant's claim this case is more like *Sotelo-Urena*, *supra*, 4 Cal.App.5th 732. In that case, the defendant testified that he believed he was going to be attacked. To support this claim, the defendant attempted to introduce expert testimony about life as a homeless individual and the risks one would encounter to support his claim. The appellate court found reversible error in excluding that proffered testimony because it could reasonably support a claim of actual belief in the need to use deadly force. (*Id*. at p. 756.) Here, the defense never established a claim of actual belief in the need to use deadly force, meaning the evidence could not be used to support such a claim. And, as noted, the excluded evidence itself does not demonstrate appellant actually believed he needed to use deadly force. Thus, its exclusion does not raise similar issues to *Sotelo-Urena*.

14.

on the issue of imperfect self-defense. Alleging the exclusion of the 911 call highlights the prejudice in this area, appellant contends there was "some bare minimum of evidence sufficient to justify the instruction" because the evidence suggested an argument occurred and that multiple people walked toward appellant's house.

Appellant correctly notes that counsel sought an instruction on imperfect self-defense and that the trial court rejected this request. The court detailed its reasoning, explaining the criteria that imperfect self-defense requires and that there was "no evidence before this court that suggests that [appellant] was in [imminent] danger of being killed or of suffering great bodily injury. No witness places any type of objects, other than a pair of gloves, at best, in Mr. Gomez'[s] hands. The others don't have any objects. Any witness that has testified has not placed any objects of any kind in any one of the witnesses' hands, so there does not appear to be any evidence that would have caused [appellant] to believe that he was in [imminent] danger of being killed or suffering great bodily injury." The court also noted the lack of evidence of appellant's state of mind, stating, "We don't have any evidence as to what [appellant] actually believed, other than suppositions .…" In fact, the court found the evidence showed the opposite, noting the evidence showed the weapon in question "was all ready to be fired when [appellant] stepped out of his own doorway, which demonstrates that before any danger may have occurred, he was ready to use deadly force himself."

As this court has previously explained, "unreasonable or imperfect self-defense is not a true defense, but instead is a shorthand description of one form of voluntary manslaughter, a lesser included offense of murder. [Citation.] 'Accordingly, when a defendant is charged with murder the trial court's duty to instruct sua sponte … on unreasonable self-defense is the same as its duty to instruct on any other lesser included offense: this duty arises whenever the evidence is such that a jury could reasonably conclude that the defendant killed the victim in the unreasonable but good faith belief in having to act in self-defense.' [Citation.] Likewise, '[t]he trial court need not give such

15.

instructions on request absent substantial evidence to support them.' " (*People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437, 1446.)

Appellant's claim that at least a bare minimum of evidence supported the requested instruction falls short of the requirements for instructing on imperfect self-defense. As recounted above, and as appellant's argument shows, the evidence in this case failed to come close to permitting a jury to reasonably conclude that the defendant killed the victim in an unreasonable but good faith belief in having to act in self-defense. At most there was a verbal dispute and some people moving toward appellant's yard. Nothing in these facts would permit a jury to reasonably infer that appellant had an honest belief that he needed to act in self-defense. Rather, as in *People v. Oropeza*, *supra*, 151 Cal.App.4th at page 82, the only evidence of appellant's state of mind was the depravity of his conduct, which was noted by the trial court in its oral rejection of the instruction request. Accordingly, we see no error in the trial court's refusal to instruct on imperfect self-defense given the evidence offered at trial.

### *Unreasonable Provocation Instruction Issue*

Next, appellant raises an instructional issue regarding the concept of unreasonable provocation. Appellant notes that the trial court instructed the jury with CALCRIM Nos. 520 and 521, which detail the offense of first degree murder and the difference between first and second degree murder. However, appellant argues the trial court should have also instructed the jury with CALCRIM No. 522, which explains the notion of provocation with respect to the type of murder committed. Appellant contends this instruction was required, despite acknowledging it was not requested, because CALCRIM No. 521 provides an insufficient description of the law to render CALCRIM No. 522 optional.

The People respond that this issue has been forfeited because CALCRIM No. 522 was not requested and no objection was raised to the sufficiency of CALCRIM No. 521. The People further contend that CALCRIM No. 521 is a sufficient recitation of the

16.

proper legal principles to render CALCRIM No. 522 a pinpoint instruction, thus requiring appellant to request the instruction. The People point the court specifically to *People v. Rogers* (2006) 39 Cal.4th 826 (*Rogers*), which held that CALJIC No. 8.20, the analogue to CALCRIM No. 521, was a proper recitation of the law and thus that an instruction on unreasonable provocation was a pinpoint instruction. Ultimately, we agree with the People.

*Factual and Procedural Background*

Following the presentation of evidence, the court held a discussion on jury instructions. Both parties requested the court give CALCRIM No. 520. The People requested the trial court give CALCRIM No. 521. The court noted appellant had not requested that instruction and asked if there was any objection to it. Counsel responded, "No." The court ultimately read the instruction as presented to the jury. Appellant did not request CALCRIM No. 522 during the jury instructions discussion.

The jury was thus instructed under CALCRIM No. 520 that "[i]f you decide that the defendant committed murder, it is murder of the second degree unless the People have proved beyond a reasonable doubt that it is murder of the first degree, as defined in CAL.CRIM [No. ]521." It was then instructed under CALCRIM No. 521 as follows: "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the consideration for and against his choice, and knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the act that caused the death. The length of time the person spends whether to kill does not, alone, determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated. On the other hand, a cold,

17.

calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time." The jury was then, again, instructed that: "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden you must find the defendant not guilty of first degree and the murder is second degree murder."

*Standard of Review and Applicable Law*

Pinpoint instructions " 'relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case .… They are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte.' " (*Rogers*, *supra*, 39 Cal.4th at p. 878.) CALJIC No. 8.73, the analogue to CALCRIM No. 522, has been held to be a pinpoint instruction. (*Rogers*, at p. 879.) The failure to request a pinpoint instruction forfeits the claim on appeal. (*People v. Jones* (2014) 223 Cal.App.4th 995, 1001.) Relatedly, the failure to object to the wording of an instruction forfeits any state law argument of error. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

In the context of the CALJIC instructions, "[i]n the absence of instructional errors … , the standard manslaughter instruction is not misleading, because the jury is told that premeditation and deliberation is the factor distinguishing first and second degree murder. Further, the manslaughter instruction does not preclude the defense from arguing that provocation played a role in preventing the defendant from premeditating and deliberating; nor does it preclude the jury from giving weight to any evidence of provocation in determining whether premeditation existed." (*Rogers*, *supra*, 39 Cal.4th at p. 880.) We review de novo whether a jury instruction correctly states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

*Discussion*

As noted above, the record in this case shows both that appellant agreed to the language of CALCRIM No. 521 and did not request any additional language or the use of

CALCRIM No. 522. Accordingly, appellant's state law claims of error have been forfeited. (*People v. Mitchell*, *supra*, 7 Cal.5th at p. 579; *People v. Jones*, *supra*, 223 Cal.App.4th at p. 1001.) In reaching this conclusion, we reject appellant's argument that *Rogers* is distinguishable "because the *Rogers* jury - unlike the jury here - was instructed with the essential principle that a 'sudden heat of passion or other condition precluding the idea of deliberation' could reduce the charge from first degree murder to second," as stated in CALJIC No. 8.20. We likewise reject appellant's claim that CALCRIM No. 521 fails to properly instruct on the law because it does not specifically discuss the concept of unreasonable provocation. (See *People v. Valentine* (1946) 28 Cal.2d 121, 132.)

As the People point out, CALJIC No. 8.20's description of the "sudden heat of passion" doctrine and its discussion of the definition of first degree murder is not meaningfully different than the more general descriptions provided in CALCRIM No. 521.

CALJIC No. 8.20 states in relevant part: "The word 'deliberate', which relates to how a person thinks, means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. [¶] The word 'premeditated' relates to when a person thinks and means considered beforehand. One premeditates by deliberating before taking action. [¶] If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree."

As given at appellant's trial, CALCRIM No. 521 states in relevant part: "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately and with premeditation…. The defendant acted deliberately if he carefully weighed the consideration for and against his choice, and knowing the

19.

consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the act that caused the death. The length of time the person spends whether to kill does not, alone, determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated."

In addition, the overall instructions given to the jury in this case included the following language from CALCRIM No. 520: "If you decide that the defendant committed murder, it is murder of the second degree unless the People have proved beyond a reasonable doubt that it is murder of the first degree, as defined in CAL.CRIM [No. ]521."

When reviewing the meaning of the two instructions, we see no meaningful difference in the import of the instructions. Although CALJIC No. 8.20 specifically utilizes the words "sudden heat of passion or other condition precluding the idea of deliberation," it does not provide any meaningful description of that phrase but rather uses it in contrast to the notions of premeditation and deliberation provided. The CALCRIM instructions, particularly in the context of the full set given in this case, do the same thing, just in different terms. They specifically identify the need to find all elements of CALCRIM No. 521 for first degree murder and specifically identify the need for premeditation and deliberation in those instructions. They further contrast the notion of premeditation and deliberation with decisions made "rashly, impulsively or without careful consideration." In this way, much like the instructions discussed in *Rogers*, "the jury is told that premeditation and deliberation is the factor distinguishing first and second degree murder," and the instructions do not "preclude the defense from arguing that provocation played a role in preventing the defendant from premeditating and deliberating; nor does it preclude the jury from giving weight to any evidence of

20.

provocation in determining whether premeditation existed." (*Rogers*, *supra*, 39 Cal.4th at p. 880.)

Based on this comparison, we see no reason to distinguish the *Rogers* conclusion that the analogous CALJIC instructions to CALCRIM No. 522 are pinpoint instructions. The general CALCRIM instructions did not fail to properly instruct the jury on the effect of a sudden heat of passion or unreasonable provocation defense on the concept of premeditation. Rather, although not providing the additional pinpoint instructions of CALCRIM No. 522, they properly instructed the jury on the need to find premeditation and deliberation and properly left open defenses suggesting the lack of those elements, even drawing a specific contrast for the jury. Accordingly, appellant was required to request CALCRIM No. 522, and his failure to do so waives any claim of error on appeal.

Further, however, our consideration of the two sets of instructions shows that any underlying claim of error in the language of CALCRIM No. 521, even if not waived by the noted failure to object, lacks merit. The instructions provided in CALCRIM No. 521, like the instructions in CALJIC No. 8.20, are sufficient to inform the jury of the relevant law and do not preclude the defense from arguing lack of premeditation under a sudden heat of passion, unreasonable provocation, or other similar doctrine. The addition of CALCRIM No. 520 ensures the jury finds the prosecution proved every element of the crime beyond a reasonable doubt. As the instructions are a proper statement of the law, only subject to supplementation from of CALCRIM No. 522 when requested and supported, we find no error in their use here.

### *Unreasonable Provocation Ineffective Assistance of Counsel Claim*

Continuing under the argument that unreasonable provocation was a valid defense that should have been presented, appellant next claims he received ineffective assistance of counsel because his trial counsel did not request CALCRIM No. 522 or argue unreasonable provocation to the jury. We do not agree.

As noted above, to show ineffective assistance of counsel, "a defendant must show that his or her counsel's performance was deficient and that the defendant suffered prejudice as a result of such deficient performance." (*People v. Mickel*, *supra*, 2 Cal.5th at p. 198.) We review ineffective assistance of counsel claims de novo. (*People v. Tapia*, *supra*, 26 Cal.App.5th at p. 950.)

Appellant's argument on this claim asserts that unreasonable provocation was the only potential strategical decision that remained after the trial court rejected proffered instructions on imperfect self-defense, and that it was a warranted defense based on the evidence of a potential argument over trash. Appellant claims there was therefore no tactical reason for counsel not to request CALCRIM No. 522 and argue unreasonable provocation to the jury, and that the failure to provide a valid argument why the killing should not be a first degree murder was prejudicial. We do not agree.

First, although counsel did not argue unreasonable provocation, counsel did not abdicate any argument in the case. Rather, as the People note, counsel argued there was a lack of premeditation and deliberation based on the speed with which the incident unfolded. Indeed, counsel was able to cite evidence from the record to support an argument that the whole incident only lasted a few seconds and that such a "rash and impulsive" act "is not first degree murder." Counsel used this argument to request a guilty verdict on the lesser crime of second degree murder, which the jury ultimately rejected.

Upon review of the record, we cannot conclude that choosing this strategy over an unreasonable provocation theory was deficient. The evidence for unreasonable provocation was limited to prior claims of trash in the yard and a singular denial of such incidents by Gomez. We think it well within counsel's reasonable discretion to determine that the speed of the incident reflected more upon the potential lack of premeditation and deliberation than any assertion that appellant felt provoked. Indeed, with appellant choosing not to testify, this court is hesitant to conclude that CALCRIM

22.

No. 522 would have been required even if requested, as the evidence supporting a claim of provocation was circumstantial and extremely limited.

In addition, upon review, we can identify no prejudice from counsel's tactical decision. Counsel chose between one of two potential arguments that could reduce the first degree murder charge to second degree murder. Neither theory was particularly strong, and the jury readily rejected the request for a second degree murder conviction on the theory counsel selected. We see nothing in the record that would suggest the unreasonable provocation theory could have changed this result. The evidence was not strong for provocation, shed no light on whether appellant was actually provoked, and the jury had no trouble finding premeditation and deliberation under the facts presented.

### *Cumulative Error Claim*

Appellant next claims that the various errors alleged in this case effectively prevented appellant from presenting a defense at all.

"Under the 'cumulative error' doctrine, we reverse the judgment if there is a 'reasonable possibility' that the jury would have reached a result more favorable to defendant absent a combination of errors. [Citations.] 'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial." ' " (*People v. Poletti* (2015) 240 Cal.App.4th 1191, 1216–1217.)

In our analysis of the various claims raised, we only considered harmless error in the context of the exclusion of appellant's 911 call and any cumulative effect of excluding statements about cursing. There we concluded the alleged errors would not have been sufficient to trigger an obligation to instruct on imperfect self-defense. For the other claims, we found there was no cognizable error. We thus find no cumulative error to consider. Upon review of the full scope of the claims raised, we are convinced appellant's trial was fair beyond a reasonable doubt. (See *People v. Rivas* (2013) 214 Cal.App.4th 1410, 1437.) There was thus no cumulative error requiring reversal.

23.

### *Resentencing Request*

Appellant next argues that a remand is required in this case because, although the trial court was aware of its discretion to strike the firearm enhancement imposed, it was unaware of its ability to substitute a lesser enhancement in place of the enhancement found true by the jury as set forth in *People v. Morrison* (2019) 34 Cal.App.5th 217 (*Morrison*). We do not agree.

Appellant's sentence included a 25-year enhancement for use of a firearm imposed pursuant to section 12022.53. During sentencing, the court explained, "The Court does believe that [appellant] deserves the maximum sentence in Count 1, which is the 25 years to life for the charge of [section] 187[, subdivision ](a) as a first-degree murder, along with the 25 years to life for the weapon enhancement pursuant to [section ]12022.53[, subdivision (d)]. And although the court does have discretion per [section ]1385 to strike the sentence on that enhancement or dismiss that sentence on that enhancement, based on his record, based on the evidence in this case, based on his long violent history at this stage to the point of a homicide does not justify the striking of that additional 25 years to life."

In *Morrison*, the First District Court of Appeal (Div. Five) concluded trial courts have "discretion to impose an enhancement under section 12022.53, subdivision (b) or (c) as a middle ground to a lifetime enhancement under section 12022.53, subdivision (d), if such an outcome [is] found to be in the interests of justice under section 1385." (*Morrison*, *supra*, 34 Cal.App.5th at p. 223.) This district, however, in *People v. Tirado* (2019) 38 Cal.App.5th 637, review granted November 13, 2019, S257658, concluded no such authority exists. This court explained, "Nothing in the plain language of sections 1385 and 12022.53, subdivision (h) authorizes a trial court to substitute one enhancement for another. Section 12022.53, subdivision (h) uses the verbs 'strike' and 'dismiss,' and section 1385, subdivision (a) states the court may 'order an action to be dismissed.' This language indicates the court's power pursuant to these sections is

24.

binary:  The court can choose to dismiss a charge or enhancement in the interest of justice, or it can choose to take no action.  There is nothing in either statute that conveys the power to change, modify, or substitute a charge or enhancement."  (*Id.* at p. 643.)  "Had the Legislature intended to grant the trial court the power to modify or reduce a firearm enhancement, it would have done so with express language."  (*Ibid*.)  Accordingly, we reject appellant's claim that the court was unaware of additional discretion to modify appellant's sentence.

Further, even if such discretion exists, we conclude it would be futile to remand for resentencing here.  " ' "Defendants are entitled to sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court.  [Citations.]  A court which is unaware of the scope of its discretionary powers can no more exercise that 'informed discretion' than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record."  [Citation.]  In such circumstances, we have held that the appropriate remedy is to remand for resentencing unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had such discretion." ' "  (*People v. Flores* (2020) 9 Cal.5th 371, 431–432.)

In this case, the court's sentencing decision shows not only that it determined it would not strike the sentencing enhancement, but also that it affirmatively believed the maximum sentence, including both the base term "along with the 25 years to life for the weapon enhancement pursuant to [section ]12022.53[, subdivision (d)]" was appropriate and warranted given the facts of the case.  Given this clear statement of intent, appellant's criminal history, and the severe facts of this case, we see no indication in the record the court would have reduced appellant's sentence even if it had been aware of some additional discretionary authority to do so.

### *Restitution Issue*

As part of his sentencing, appellant was ordered to pay a $10,000 restitution fine pursuant to section 1202.4. During sentencing, appellant argued, "With regard to the recommendations made by probation in the report, I would be objecting to the restitution amount of $63,000. There is also an additional fine that is being asked of $10,000. If the Court -- assuming that the Court is going to impose the $63,000 restitution amount, I would be asking the Court to not impose the $10,000 amount. I think that would ensure that any and all money that the government takes from [appellant] during his incarceration would then go towards that $63,000 amount." Appellant, relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), contends on appeal that the trial court erred in failing to stay his restitution fine because there was no ability to pay hearing.

We do not agree. This court has previously concluded that *Dueñas* was wrongly decided and that an Eighth Amendment excessive fines clause analysis should apply to such objections. (*People v. Aviles* (2019) 39 Cal.App.5th 1055, 1067–1072.) Under that standard, we cannot conclude the fines imposed in this case are grossly disproportionate to appellant's level of culpability; thus, they are not excessive under the Eighth Amendment to the United States Constitution. (*Id.* at p. 1072.)

Further, even if we were to consider *Dueñas* well-reasoned, we would still not apply it to a case like this as we consider *Dueñas* to be heavily dependent upon its specific factual scenario. In *Dueñas*, the defendant lost her driver's license because she was financially unable to pay her juvenile citations. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1161.) The aggregating criminal conviction assessments and fines imposed as she drove without a license prevented her from recovering her license. (*Ibid.*) The *Dueñas* court described this as "cascading consequences" stemming from "a series of criminal proceedings driven by, and contributing to, [the defendant's] poverty." (*Id.* at pp. 1163–1164.) As a result, the defendant faced ongoing unintended punitive consequences because of the imposed financial obligations that the *Dueñas* court concluded were

"fundamentally unfair." (*Id*. at p. 1168.) Such is not the case here, where the restitution fine is imposed specifically based on appellant's individualized conduct and is not part of a fundamentally unfair cascading set of unintended punitive consequences. Accordingly, we do not find *Dueñas*'s analysis instructive in this case. (See *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1054–1055.)

### *Motion to Expand Appointment*

Finally, in a separate filing, appellant's counsel requested this court expand their appointment "to include the preparation and filing of a petition for writ of habeas corpus in this Court, or the Superior Court" based on an ineffective assistance of counsel claim. This claim arises from trial counsel's allegedly incorrect determination that an expert witness could not be called to support appellant's defense theories unless appellant testified first. This court previously deferred ruling on the request until reaching the merits of this appeal. Having reviewed the scope of appellant's appeal and request, the motion is granted. Appellant's counsel's appointment is expanded to include the preparation and filing of a petition for writ of habeas corpus in this court. We agree with counsel that judicial efficiency warrants filing the claim in this court.

### DISPOSITION

The judgment is affirmed. The trial court is ordered to prepare an amended abstract of judgment that accurately reflects appellant was convicted by jury of count 2, shooting at an inhabited dwelling, in violation of section 246. The trial court is further ordered to forward a copy of the amended abstract to the Department of Corrections and Rehabilitation.

27.

Appellant's counsel's motion to expand their appointment is granted. Counsel's appointment shall include preparing and filing a petition for writ of habeas corpus in this court.


HILL, P.J.

WE CONCUR:


POOCHIGIAN, J.


DETJEN, J.